**CEDAR BROOK SERVICE STATION, INC., et al., Plaintiffs,**

v.

**CHEVRON U.S.A., INC., and Cumberland Farms, Inc., Defendants.**

No. 86 C 4240.

United States District Court, E.D. New York.

Aug. 13, 1990.

Arnold P. Azarow (Susan G. Piskiel, of counsel), Westbury, N.Y., for plaintiffs.

Cohen, Milstein, Hausfeld & Toll (Jerry S. Cohen, of counsel), Washington, D.C., for plaintiffs.

Wilentz Goldman & Spitzer (Frank M. Ciuffani, of counsel), Woodbridge, N.J., Pillsbury Madison & Sutro (Robert P. Taylor, of counsel), San Francisco, Cal., for defendant Chevron U.S.A. Inc.

Dewey, Ballantine, Bushby, Palmer & Wood (John Collins, of counsel), New York City, Collier, Shannon & Scott (James R. Loftis, III, R. Timothy Columbus, Gerard P. Fox, Robert M. Hubar, of counsel), Washington, D.C., Mark G. Howard, Canton, Mass., for defendant Cumberland Farms, Inc.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

In 1986, defendant Chevron U.S.A. Inc. ("Chevron") sold its United States northeast regional motor fuel properties, including service stations and related contracts and leases to defendant Cumberland Farms Inc. ("Cumberland"). Plaintiffs, eleven New York service station dealers, brought this action against Chevron and Cumberland to set aside the sale as violative of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* (hereinafter the "Act") and of New York law, asserting that under the Act plaintiffs are entitled to an opportunity to purchase the stations they leased under their franchise agreements.

Citing recent federal court decisions, defendants move to reconsider Judge Costantino's decision denying them summary judgment in a Memorandum and Order of June 5, 1989, 746 F.Supp. 268 ("*Cedar Brook I*"), familiarity with which is assumed.

*Background*

This is one of various suits challenging Chevron's sale to Cumberland of various motor fuel marketing assets Chevron had acquired from the Gulf Corporation in 1984. The history of that takeover and of the decision to sell those assets is more fully detailed in *Cedar Brook I.*

The sale transferred to Cumberland almost five hundred service station properties, as well as gasoline distribution terminals, warehouses, associated inventories, accounts receivable, and other properties, together with Chevron's supply agreements with jobbers and service station dealers, including plaintiffs.

Under the asset purchase agreement Cumberland assumed all of Chevron's contractual commitments, including its leases to service station dealers such as plaintiffs, and related supply agreements. As franchise agreements came up for renewal, Cumberland was obligated to offer, in good faith, a new franchise to each dealer on non-discriminatory terms and conditions, in accordance with the Act.

To ensure that the "Gulf" trademark remained available to Gulf dealers, Chevron granted Cumberland exclusive use of the trademark in the northeast United States for 15½ years at no royalty, with an option to renew indefinitely for $1,000,000 per year. Chevron also transferred its northeast Gulf and Chevron credit card systems, and agreed to sell Cumberland virtually the entire gasoline output of Chevron's Philadelphia refinery. This agreement, extended in 1987, continues on a year-to-year basis.

By letter dated February 14, 1986, Chevron notified all affected Gulf and Chevron dealers of the sale, which closed on May 31, 1986. That letter advised each dealer that Chevron did not believe that the sale to Cumberland triggered the Act or represented a termination or nonrenewal of the dealer's contract of sale, service station lease and related agreements with Chevron. The letter assured the dealers that they would

retain all of their rights under the Act against Cumberland Farms.

The letter went on to recite that, on the chance that someone might later claim that the transfer involved a termination or non-renewal subject to the Act, Chevron was taking the precaution of giving formal notice of nonrenewal of dealer agreements in accordance with the Act, although "in fact" the agreements with Chevron would continue in effect and would be renewed by Cumberland.

At the time of the sale plaintiffs were leasing their stations and purchasing gasoline from Chevron under product supply agreements for resale under the Gulf trademark. After the sale plaintiffs continued to do business under their service station leases, using the Gulf trademark, buying gasoline at the same prices as they had from Chevron. As each dealer lease expires, Cumberland offers a new lease which contains a seven percent increase over the previous rent plus increases in applicable property taxes. Seven plaintiffs have signed new leases with Cumberland.

Plaintiffs claim that the sale resulted in the termination or nonrenewal of their franchises in violation of the Act. The Act provides that no franchisor may "terminate any franchise" or "fail to renew any franchise relationship" except under the conditions enumerated in the Act. 15 U.S.C. § 2802(a).

Defendants contend that there has been no such termination or failure to renew within the meaning of the Act, arguing that the assignment did not affect the statutory rights of the franchisees and that there was no constructive termination of the franchise by reason of an assignment invalid under state law.

Alternatively, defendants say that even if the assignment be deemed a termination of the franchises, defendants complied with the market withdrawal provisions of 15 U.S.C. § 2802(b)(2)(E), reciting the conditions under which a franchisor withdrawing from a regional market may decline to renew a franchise relationship.

*Standard of Review*

■ As plaintiffs point out, *Cedar Brook I* is now "law of the case." Generally, once a court decides a rule of law, that decision should govern the same issues in later stages of the case. *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983). But this is no more than a sensible practice in the judge's discretion, and does not prohibit the court from correcting error. *See id.* Where circumstances warrant the court may reconsider. *See Dictograph Products Co. v. Sonotone Corp.,* 230 F.2d 131, 134 (2d Cir.) *cert. dismissed,* 352 U.S. 883, 77 S.Ct. 104, 1 L.Ed.2d 82 (1956).

Such circumstances exist here. Since the argument of *Cedar Brook I,* two circuit courts have ruled on the issue of whether the Act applies to an assignment in cases involving either the assignment from Chevron to Cumberland, *see Ackley v. Gulf Oil Corp.,* 889 F.2d 1280 (2d Cir.1989), *aff'g* 726 F.Supp. 353 (D.Conn.), *cert. denied,* —— U.S. ——, 110 S.Ct. 1811, 108 L.Ed.2d 941 (1990), or one identical in its terms, *see May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917 (6th Cir.1989). In light of these decisions, the District of New Jersey has recently reconsidered and changed its decision in another case involving this transaction cited in *Cedar Brook I. See Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.,* No. 86–4748, 86–5107, opinion at 6–7, 1990 WL 61787 (D.N.J. May 4, 1990) (hereinafter *Florham Park III*).

■ The court thus considers it appropriate to entertain defendants' renewed motion for summary judgment. It may grant summary judgment if "there is no genuine issue as to any material fact." Fed.R. Civ.P. 56(c). The burden of so showing rests on the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The court resolves all ambiguities and draws all reasonable inferences in favor of the party opposing the motion. *Donahue v. Windsor Locks Board of Fire Commissioners,* 834 F.2d 54, 57 (2d Cir.1987).

*Applicability of the Act*

■ The overriding purpose of the Act was to protect franchisees from "arbitrary and discriminatory terminations or nonrenewals of their franchises." S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Admin.News 873, 874 (hereinafter Senate Report). To this end, the Act prohibits franchisors from terminating a franchise or not renewing a franchise relationship except under specific enumerated conditions. *See* 15 U.S.C. § 2802(b).

In order to establish a claim under the Act, a franchisee must prove either a termination of the franchise or nonrenewal of the franchise relationship. "Franchise relationship" is defined in the statute as "the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise." 15 U.S.C. § 2801(2).

*Cedar Brook I* rejected defendants' argument that there was no termination or nonrenewal of the franchise relationship because Cumberland completely assumed Chevron's obligations. The court distinguished the term "franchise relationship" as defined in the Act at 15 U.S.C. § 2801(2) from the same term as used in § 2802(b)(2)(A). Citing the Senate Report at page 30, 1978 U.S.Code Cong. & Admin. News at p. 888, the court in *Cedar Brook I* read that term as used in § 2802(b)(2) to mean "the *relationship* between the parties rather than the *specific rights or obligations* of the parties under the franchise agreement." *Cedar Brook I,* memorandum at 11 (emphasis added in opinion). The court considered Chevron's withdrawal from retail marketing constituted a nonrenewal of the "relationship", even though plaintiffs were afforded continued protection of their franchise rights. *Id.* at 11–12.

On reconsideration, an examination of the legislative history persuades this court that it does not support this conclusion. The relevant passage is as follows:

In connection with the nonrenewal provisions of the title, ... [t]he term [franchise relationship] is utilized for two reasons. First, in the renewal context, the contract which constitutes the franchise may no longer exist and the term "franchise relationship" is utilized to avoid any contention that because the "franchise" does not exist there is nothing to renew. The renewal provisions of the title address the renewal of the relationship between the parties rather than the specific rights or obligations of the parties under the franchise agreement. Second, because the title contemplates changes in the specific provisions of the franchise agreement at the time of renewal, the title requires renewal of the relationship between the parties as distinguished from a continuation or extension of the specific provisions of the franchise agreement. Use of the narrow term "franchise" in this context could raise unintended questions regarding the ability of the franchisor to comply with the renewal obligations of the title by offering a franchise agreement which differs in any particular from the expiring franchise.

Senate Report at 30, 1978 U.S.Code Cong. & Admin.News at 888. In other words, the term "franchise relationship" signifies more than the provisions of a particular expiring franchise agreement. Thus, the franchisor in renewing the franchise need not offer terms identical to those in an expiring franchise, provided, of course, that the basic franchise relationship is maintained. By the same token, the franchisor cannot put off the franchisee's request to renew until the franchise has expired and then claim there is no franchise to renew.

But this court does not read the Senate Report to suggest that the franchise relationship must exist only between the same "parties," so that no assignment by the franchisor is valid. The language of the Senate Report is entirely consistent with the statutory definition in 15 U.S.C. § 2801(2) of the "franchise relationship" as the respective "motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which re-

sult from the marketing of motor fuel under a franchise."

The Act in 15 U.S.C. § 2801(1) defines a "franchise" in terms of three elements, namely, a contract to use the refiner's trademark, a contract for supply of fuel to be sold under the mark, and a lease of premises for sale of the fuel. *See Barnes v. Gulf Oil Corp.*, 795 F.2d 358, 360 (4th Cir.1986). So long as the franchisee retains the right to enforce these obligations and responsibilities, there has been no failure to renew the franchise relationship. The fact that these obligations and responsibilities have been assumed by some one other than the franchisor does not mean there is no franchise.

Plaintiffs have neither alleged nor presented evidence that the assignment compromised any of the three elements defined by the Act to constitute plaintiffs' "franchises." Cumberland purchased the stations leased by plaintiffs, who continue to occupy them under either the terms of their leases with Chevron or renewal leases. Cumberland acquired the right to use the Gulf trademark with an option to renew indefinitely. Plaintiffs conduct their business under the Gulf trademark, with the benefit of the Gulf and Chevron credit card system. Plaintiffs continue to purchase Gulf brand gasoline, with supply still guaranteed from Chevron's Philadelphia refinery and Cumberland's other sources.

The provisions of 15 U.S.C. § 2806(b) make it clear that the mere making of an assignment valid under state law does not accomplish a "termination" of the franchise or "failure to renew" the franchise relationship. That section provides, in pertinent part, that "nothing" in the Act "prohibits any transfer or assignment of any franchise" as authorized by the franchise or by state law. It is fatuous to suppose that legislation including this provision had as its purpose to make every assignment of a franchise a "termination" or "failure to renew."

Of course, the assignee, in this case Cumberland, is not as a result of the assignment free to flout the Act. Should Cumberland terminate a franchise or fail to

renew a franchise relationship, plaintiffs retain their statutory rights.

Moreover, the terms of the Act suggest that Congress did not design it to prohibit petroleum companies from making all large scale assignments of assets such as the one at issue. *May–Som Gulf*, 869 F.2d at 921–22; *Florham Park III*, opinion at 10; *Russo v. Texaco, Inc.*, 630 F.Supp. 682, 683 (E.D.N.Y.1986).

■ This court concludes that, provided the assignment is valid under applicable state law, the Act does not make the assignment a termination of a franchise or a failure to renew a franchise relationship.

The United States District Court for the District of Connecticut reached the same result in *Ackley v. Gulf Oil Corp.*, 726 F.Supp. 353 (D.Conn.1989) (hereinafter "*Ackley*") and the Court of Appeals affirmed "substantially" for the reasons given by the District Court. *Ackley v. Gulf Oil Corp.*, 889 F.2d 1280 (2d Cir.1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1811, 108 L.Ed.2d 941 (1990). Similar holdings were made in *May–Som Gulf* and *Florham Park III*.

■ An assignment invalid under state law may be regarded as a constructive termination under the Act. Such a purported assignment might infringe the franchisee's rights under the Act. *See Barnes v. Gulf Oil Corp.*, 795 F.2d 358, 363 (4th Cir.1986). But plaintiffs have not alleged illegality under New York law. New York permits assignment of contractual rights and delegation of contractual duties, except where the contract calls for personal services, or prohibits assignment, or where assignment materially alters the rights and duties of the other party. *Smith v. Craig*, 211 N.Y. 456, 461, 105 N.E. 798 (1914). Plaintiffs have not argued any such exception applies to their leases and supply agreements.

■ A lease agreement, such as the service station leases here, is freely assignable incidental to the sale of the leased property, absent some restriction in the lease. *Reltron Corp. v. Voxakis Enterprises*, 57 A.D.2d 134, 137–8, 395 N.Y.S.2d 276, 279

(4th Dep't 1977). Plaintiffs allege no such restriction.

The element of plaintiffs' franchises that comprises the supply agreements for gasoline is governed by New York's version of section 2–210 of the Uniform Commercial Code, which provides in relevant part:

> (1) A party may perform his duty through a delegate unless otherwise agreed or unless the other party has a substantial interest in having his original promisor perform or control the acts required by the contract. (...)
>
> (2) Unless otherwise agreed all rights of either seller or buyer can be assigned except where the assignment would materially change the duty of the other party, or increase materially the burden or risk imposed on him by his contract, or impair materially his chance of obtaining return performance.

N.Y.U.C.C. § 2–210.

As noted above, plaintiffs have neither alleged that Chevron's duties under the supply agreements were personal nor non-delegable by agreement. *See May–Som Gulf*, 869 F.2d at 924. Nor have plaintiffs provided any evidence that the assignment has materially changed their duties, increased their burdens, or impaired their chance of receiving return performance.

Plaintiffs have alleged that (1) Cumberland is more interested in maximizing the value of its acquired real estate than in maintaining unprofitable stations, and has converted several stations not involved in this suit into convenience food stores; (2) Cumberland's president opined he would change or drop the Gulf trademark if by doing so he could sell more gasoline; (3) the gasoline pricing formula for Cumberland-operated stations is different and historically somewhat lower than that used for dealer-operated stations; (4) the new franchise leases give Cumberland the right of first refusal if a franchisee wishes to assign his franchise, and involve higher rents than the old franchises; and (5) some stations have used a combined Cumberland–Gulf logo.

These and similar allegations have been considered and found wanting by the courts in the supervening decisions of *Ackley, May–Som Gulf,* and *Florham Park III.* Missing from the present record is any evidence that these circumstances have harmed or may harm the plaintiffs. To the extent that they are speculative, such allegations are insufficient to raise an issue of material fact. *Ackley,* 726 F.Supp. at 363. As mentioned above, should Cumberland wilfully terminate the Gulf trademark, or improperly terminate plaintiffs' leases, plaintiffs at that moment will have a claim under the Act. *Id.*

Changes made by Cumberland that were within Chevron's prerogative to make are likewise insufficient to show a burden or impairment flowing from the assignment at issue. The franchise agreements establish no fixed or comparative price of gasoline to be sold to dealers. *See Ackley,* 726 F.Supp. at 364, *May–Som Gulf,* 869 F.2d at 924. Changes that Cumberland subsequently instituted in renewal leases are not relevant to the question whether the initial assignment materially increased plaintiffs' burdens or risks. Ancillary issues concerning Cumberland's supposed deficiencies in support services, such as training, advertising, or promotion, are likewise irrelevant as plaintiffs have shown no contractual right to these services. They are not part of a franchise under the Act. *May–Som Gulf,* 869 F.2d at 925.

The court finds plaintiffs' other arguments without merit for the reasons given in *Ackley* and *May–Som Gulf.* Plaintiffs have failed to raise an issue of material fact as to whether the assignment violated either plaintiffs' franchises under the Act or New York law.

The court need not address defendants' alternative argument that they have complied with the market withdrawal provisions of the Act.

*State Law Claim*

No federal issue remains. The court therefore declines to consider the pendent claim under New York's General Business Law. *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

*Conclusion*

The court's order of June 5, 1989 is vacated and defendants' motion for summary judgment is granted.

So ordered.